UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

LM GENERAL INSURANCE COMPANY;
LM INSURANCE CORPORATION;
LIBERTY MUTUAL PERSONAL
INSURANCE COMPANY; AMERICAN
ECONOMY INSURANCE COMPANY; and
SAFECO INSURANCE COMPANY OF
ILLINOIS,

                    Plaintiffs,

v.

SPECIALTY MEDICAL CENTER, INC.;
SPINEMD OF MICHIGAN PLLC; and
MEDSPECIALISTS OF MICHIGAN,
PROFESSIONAL LIMITED LIABILITY
COMPANY,

                    Defendants.

C.A. No. _____

**Demand for Jury Trial**

## **COMPLAINT**

Plaintiffs LM General Insurance Company, LM Insurance Corporation, Liberty Mutual Personal Insurance Company, American Economy Insurance Company, and Safeco Insurance Company of Illinois (collectively, "Liberty Mutual" and/or "plaintiffs") hereby allege as follows.

1

## I.   <u>INTRODUCTION</u>

1.      This is a case about medical clinics and their owners, managers, agents, and representatives who abused the medical benefits available under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*. and defrauded Liberty Mutual by submitting and causing to be submitted false and fraudulent medical records, bills, and invoices through the U.S. Mail seeking to collect payment from Liberty Mutual for treatment and services that were not actually performed, were medically unnecessary, were fraudulently billed, and were not lawfully rendered pursuant to applicable statutes and regulations, including the Michigan No-Fault Act.

2.      Defendants Specialty Medical Center, Inc. ("Specialty Med"), SpineMD of Michigan PLLC ("SpineMD"), and MedSpecialists of Michigan, Professional Limited Liability Company ("MedSpecialists") (collectively, the "defendants") each conspired to, and did in fact, defraud Liberty Mutual by perpetuating an insurance fraud scheme in violation of federal and state law.

3.      The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in payments from Liberty Mutual to and on behalf of the defendants pursuant to Michigan's No-Fault Act.

4.      All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

2

5.     By this Complaint, and as detailed in each count set out below, Liberty Mutual brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment.  Liberty Mutual also seeks declaratory relief that no previously-denied and pending claims submitted to it by the defendants are compensable.

## II.   THE PARTIES

### A.   PLAINTIFFS

6.     LM General Insurance Company, LM Insurance Corporation, and Safeco Insurance Company of Illinois are each a company duly organized and existing under the laws of the State of Illinois.

7.     Liberty Mutual Personal Insurance Company is a company duly organized and existing under the laws of the Commonwealth of Massachusetts.

8.     American Economy Insurance Company is a company duly organized and existing under the laws of the State of Indiana.

9.     LM General Insurance Company, LM Insurance Corporation, Liberty Mutual Personal Insurance Company, American Economy Insurance Company, and Safeco Insurance Company of Illinois each have their respective principal places of business in Boston, Massachusetts.

10.     At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

### B.     DEFENDANTS

#### 1.     Specialty Medical Center, Inc.

11.     Defendant Specialty Med is incorporated under the laws of the State of Michigan.

12.     Specialty Med's principal place of business is in Dearborn, Michigan.

13.     At all relevant times, Specialty Med was operated and conducted by defendants SpineMD and MedSpecialists.

14.     Specialty Med billed Liberty Mutual for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and were unlawful in relation to Liberty Mutual insureds, including the patients identified in Exhibit 1.

#### 2.     SpineMD of Michigan PLLC

15.     Defendant SpineMD is a professional limited liability company organized under the laws of the State of Michigan.

16.     The member of SpineMD is Jeffrey Oppenheimer, M.D. ("Oppenheimer"), who is a citizen of the State of Florida.

17.     At all relevant times, SpineMD was operated and conducted by defendants Specialty Med and MedSpecialists.

4

18. SpineMD billed Liberty Mutual for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and were unlawful in relation to Liberty Mutual insureds, including the patients identified in Exhibit 2.

### 3. MedSpecialists of Michigan, Professional Limited Liability Company

19. Defendant MedSpecialists is a professional limited liability company organized under the laws of the State of Michigan.

20. The member of MedSpecialists is Stefan Pribil, M.D. ("Pribil"), who is a citizen of the State of Florida.

21. At all relevant times, MedSpecialists was operated and conducted by defendants Specialty Med and SpineMD.

22. MedSpecialists billed Liberty Mutual for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and were unlawful in relation to Liberty Mutual insureds, including the patients identified in Exhibit 3.

## III. JURISDICTION AND VENUE

23. Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action on the basis of the claims brought by the plaintiffs under 18 U.S.C. § 1961, *et seq.* because they arise under the laws of the United States.

24.     Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states.

25.     Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

26.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV.    BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME

27.     The defendants conducted the RICO enterprises discussed herein – Specialty Med, SpineMD, and MedSpecialists – to submit exorbitant charges to Liberty Mutual for purported medical services, procedures, and testing that were not actually provided, were not medically necessary, and were fraudulently billed.

28.     The purpose of the scheme was to generate the highest possible amount of charges to Liberty Mutual by abusing the Michigan No-Fault Act.

29.     The defendants are closely interrelated and use the same address at 13530 Michigan Avenue in Dearborn, MI to see patients.  Specialty Med also has a second location at 5456 15 Mile Road in Sterling Heights, MI.

30.     The face of the scheme is Specialty Med, which advertises itself as "providing alternative approaches for managing and relieving pain."

31.   In reality, the "alternative approaches" used by Specialty Med are unproven and experimental procedures that were selected by the defendants in order to avoid the application of the No-Fault Act's fee schedule.

32.   These alleged procedures are "alternative" and not covered by the No-Fault Act's fee schedule precisely because they are unproven and ineffective for patients.  The defendants promote these ineffective procedures because their goal is not to heal patients but to bill enormous charges to auto insurers using alleged therapies for which they can set exorbitant prices.

33.   Part of the defendants' scheme involved selling their bills to third parties called "factoring" companies, which bought the defendants' accounts receivable for a small percentage of the bills' face value and then tried to collect the full face value of the bill from insurance companies like Liberty Mutual.  This portion of the scheme allowed the defendants to immediately monetize their fraud without having to wait for the insurance company to review and pay the bill. Because the defendants were paid a percentage of the face value of the bill by the factoring companies, the defendants were also motivated to bill for excessive treatment at unconscionably high charges.

34.   As a result, the defendants are incentivized to charge the greatest amount possible without regard for necessary, reasonable, and lawful treatment, so they can sell their accounts receivable at a higher price.

35.     The defendants have sold accounts receivable to at least one factoring company called "Funding 4 Doctors."

36.     Specialty Med's physicians include Horst Griesser, M.D. ("Griesser"), Oppenheimer (the owner of SpineMD), and Pribil (the owner of MedSpecialists).

37.     Oppenheimer and Pribil both reside in Florida and travel occasionally to Michigan to take advantage of Michigan's high limits for No-Fault benefits.

38.     Griesser is a non-board-certified physician who claims to specialize in internal and emergency medicine.

39.     Oppenheimer has an extensive history of malpractice and has disclosed to the Florida Department of Health at least ten (10) malpractice lawsuits filed against him since 2009.

40.     Specialty Med bills for alleged evaluations and for unnecessary and experimental treatments, and it refers patients to other associates and participants in the scheme to generate even more billing, including SpineMD and MedSpecialists.

41.     Specialty Med frequently billed excessive charges for experimental "shock wave" therapy that uses compressed air to fire projectiles against applicators placed on a patient's skin, and which has not been approved for the treatment of back and neck pain.

42.     SpineMD exclusively bills for unnecessary testing that, if performed at all, should have been included in evaluations performed by Specialty Med.

43.     Such testing primarily includes alleged computerized range of motion and muscle strength measurements that purport to be taken using specialized equipment and software.  In reality, these alleged tests are nothing more than typical evaluations that should be done as a component of any examination of a patient complaining of musculoskeletal injury.

44.     MedSpecialists is owned by Pribil and is used to bill for alleged spinal surgeries to Specialty Med's patients.

45.     Pribil practiced in Florida until he was recruited to travel to Michigan by Wesley Blake Barber and Michael Angelo, both of whom have extensive criminal histories and well-documented participation in healthcare fraud schemes.

46.     Wesley Blake Barber has a lengthy history in the medical factoring business and was indicted for his role in a scheme to recruit women to fly to different states for medically unnecessary surgeries involving removal of transvaginal mesh. *See* United States of America v. Wesley Blake Barber, *et al.*, No. 1:19-cr-00239 (E.D.N.Y.). He entered a guilty plea in 2021.

47.     Michael Angelo was indicted both federally (in April 2022) and by the State of Michigan (in April 2023) for various crimes including auto insurance fraud, tax fraud, and conducting a criminal enterprise, all related to taking advantage of Michigan residents who were in auto accidents and profiting from them using Michigan's No-Fault Act.

48.    Pribil himself has been repeatedly sued by insurers in Michigan for billing for spinal surgeries that are unnecessary and fraudulently billed, including through his previous Michigan practice, iSpine, PLLC, which was heavily engaged in selling accounts receivable through factoring agreements arranged by Wesley Blake Barber.

49.    MedSpecialists is a new entity that Pribil formed to continue the same scheme of aggressively billing for unnecessary spinal surgeries and inflating charges through fraudulent billing practices.

50.    For all the reasons set forth herein, the bills submitted by the defendants were never compensable.  Accordingly, Liberty Mutual is entitled to a return of all monies it was fraudulently induced to pay to the defendants.

51.    Liberty Mutual is also entitled to a declaratory judgment that it is not required to pay any further amounts in response to the defendants' fraudulent bills.

## V.    BILLING FOR SERVICES NOT RENDERED

52.    The defendants regularly submitted bills to Liberty Mutual seeking payment for treatment and services that were never rendered to patients at issue herein.

53.    The defendants' pervasive conduct of mailing demands for payment for services that were not rendered is indicative of their goal to submit as many bills for

payment as possible regardless of whether the treatment was actually rendered and whether it was medically necessary (discussed in detail *infra*).

54.     All of the bills submitted by the defendants to Liberty Mutual through the U.S. Mail seeking payment for treatment that never occurred are fraudulent.

55.     Liberty Mutual is not required to pay the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants as a result of their fraudulent billing for services not rendered.

### A.     COMPUTERIZED RANGE OF MOTION TESTING NOT PERFORMED

56.     SpineMD billed for extensive computerized range of motion ("ROM") and muscle strength testing that served no medical purpose and much of which was not performed at all.

57.     SpineMD billed for this unnecessary and redundant ROM testing using Current Procedural Terminology ("CPT")[1] code 95851, which describes testing performed to "each extremity or trunk section," and not to individual tests or movements to a body part or region.

---

[1] CPT codes are published annually by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.  Providers who are subject to the Health Insurance Portability and Accountability Act ("HIPAA") are required to use CPT codes.

58.     Indeed, it is required that tests be performed on an entire extremity or trunk section to bill for just one (1) unit of CPT code 95981.

59.     The federal government has explained that to use CPT code 95851 "for extremity ROM testing, every joint of an extremity would need to be tested, with documentation of why such a thorough assessment was warranted. It would not be appropriate to bill code 95851 if only shoulder ROM needed to be tested."

60.     As detailed below, the defendants never provided any explanation as to why redundant ROM testing was warranted, and never used the test results to direct patient treatment.

61.     SpineMD also improperly billed separate units of CPT code 95981 for each individual test allegedly performed to the patients at issue herein.

62.     For example, SpineMD billed Liberty Mutual for 60 units of ROM testing using CPT code 95851 to patient A.B. (Claim No. 046099794)[2] on both November 10, 2022 and March 15, 2023, for a total of 120 units.  ROM testing was allegedly performed on A.B.'s arms, lumbar region, and cervical region on both dates, which should have resulted in no more than eight (8) units of CPT code 95851,

---

[2] To protect the confidentiality of the patients at issue herein, Liberty Mutual refers to them by initials and Liberty Mutual's claim number.  As the defendants submit bills to Liberty Mutual using the Liberty Mutual claim number, they are aware of the identity of these patients.

meaning at least 52 of the units of service billed by SpineMD on each date of service were not performed.

63.     In fact, SpineMD billed exactly 60 units of CPT code 95851 to every patient and on every date of service for which it billed these alleged tests but never provided more than four (4) units, if it provided any at all.  *See* Exhibit 2.

64.     This fraudulent billing for services not rendered enabled SpineMD to multiply its ROM bills by a factor of at least fifteen (15), turning what should have been a charge for $395 or less (using SpineMD's own pricing, and if any medically appropriate services were provided at all, which they were not) into a charge for $5,925.  Id.

### B.     ASSISTANT SURGEON SERVICES NOT RENDERED

65.     MedSpecialists routinely billed for alleged surgical assistance by Griesser or David Atkins, PAC ("Atkins") during procedures allegedly done by Pribil.

66.     There is no evidence that these alleged surgical assists were actually performed, much less that they were medically necessary.

67.     A bill for the services of a surgical assistant is only proper when the billing physician actively assists the primary physician in performing the surgical procedure and provides more than just ancillary services.

68.   The role of the assistant surgeon must be clearly documented in the operative report to establish the medical necessity of having multiple surgeons involved in one procedure.

69.   MedSpecialists's submissions to Liberty Mutual never substantiated either the presence of an assistant surgeon or the need for one in the alleged procedures.

70.   MedSpecialists nevertheless billed $9,000 for these purported services with respect to every billed surgery.  *See* Exhibit 3.

71.   For example, MedSpecialists billed Liberty Mutual for an alleged cervical surgery on patient W.G. (Claim No. 043748662) on February 14, 2023.

72.   The operative report for this procedure lists Atkins as the "assistant," but is completely devoid of any reference to services provided by Atkins.

73.   In fact, other than listing him as the purported assistant in the header, the two-page narrative description of the alleged surgery contains no mention of either Atkins or an assistant at all.

74.   Similarly, MedSpecialists billed Liberty Mutual for an alleged lumbar surgery on patient J.M. (Claim No. 041429321) on December 7, 2021.

75.   The operative report lists Griesser as the assistant, but other than listing him in the header the report makes no mention whatsoever of either Greisser or an assistant.

C.   **CHARGES FOR "SPECIAL REPORTS" THAT DO NOT EXIST**

76.   MedSpecialists routinely billed for purported "special reports or forms" allegedly completed by Pribil each time he evaluated a patient.

77.   MedSpecialists billed $1,250 for this alleged service using CPT code 99080.  *See* Exhibit 3.

78.   The billing code used by MedSpecialists is for "Special reports such as insurance forms, more than the information conveyed in the usual medical communications or standard reporting form."

79.   These alleged services were not rendered as MedSpecialists did not submit any special reports or forms to Liberty Mutual above and beyond what is normally required to support an office visit (called an evaluation and management service).

80.   In fact, as explained more fully *infra*, MedSpecialists's submissions for Pribil's alleged patient evaluations failed to meet the minimum requirements for the office visit/evaluation codes themselves, let alone additional and special reporting.

81.   The bills from MedSpecialists for Pribil's alleged examinations were charged at the excessive and uncustomary rate of $1,244 for evaluations of established patients, for a total of $2,494 when combined with the bill for the non-existent special report.  Id.

82.     These excessively charged evaluations frequently resulted in nothing more than a single paragraph that contained no indication that Pribil performed a physical examination or took a reevaluation patient history as required for evaluation codes billed.

### D.     SURGERIES NOT PERFORMED

83.     On at least one occasion, MedSpecialists billed for a cervical spine surgery that was not performed at all.

84.     On February 1, 2022, MedSpecialists billed for a total disc replacement surgery to patient W.G.'s (Claim No. 043748662) cervical spine allegedly performed by Pribil.

85.     The operative report states that Pribil found abnormal anatomy and had to abort the surgery in the early stages of the procedure.

86.     The abnormal anatomy turned out to be a goiter that W.G. had surgically removed by other providers approximately one week later.

87.     MedSpecialists nevertheless billed the entire $64,750 cost of the completed surgery including for both a discectomy and a disc replacement.

88.     When a procedure is aborted, the provider must append modifier 53, and may only bill the code that most closely describes the portion of the procedure that was actually performed, and not any additional codes that were not completed or begun.

89.     According to MedSpecialists itself, the procedure was aborted while Pribil was attempting to remove disc material, but before he had done so.

90.     At most, MedSpecialists should only have billed for the attempted discectomy and appended modifier 53.  Instead, it fraudulently also billed for the disc replacement that never took place.

91.     MedSpecialists then billed the full $64,750 a second time for the exact same procedure to W.G., when Pribil allegedly completed it a year later.

92.      It also billed for Griesser to act as an assistant surgeon even though the operative report was, as usual, devoid of any reference to either Griesser or an assistant.

93.     MedSpecialists always fraudulently billed codes 22856 and 22858 for alleged disc replacements.

94.     As explained more fully *infra*, MedSpecialists routinely billed for both disc removal and disc replacement despite the fact that the removal is an essential and already-included component of disc replacement.

## VI.    UNLAWFUL AND UNLICENSED PROVISION OF DURABLE MEDICAL EQUIPMENT

95.     In order to legally issue durable medical equipment ("DME") in Michigan, a provider must obtain a license from the Michigan Board of Pharmacy.

96.    A license from the Michigan Board of Pharmacy is required for all "drugs and devices manufactured, distributed, prescribed, dispensed, administered, or issued in this state . . . ."  Mich. Comp. Laws § 333.17722.

97.    Specialty Med has billed Liberty Mutual for purportedly dispensing and issuing DME to patients at issue herein.  *See* Exhibit 1.

98.    Specialty Med has never possessed a license to issue DME in the State of Michigan at any time relevant to this action.

99.    Despite having no license to issue DME, Specialty Med has billed Liberty Mutual more than $25,000 in DME purportedly issued to patients at issue herein.  Id.

100.   Because Specialty Med did not possess a license to issue DME, its bills for purportedly doing so were unlawful and not compensable under the No-Fault Act.

101.   Liberty Mutual is not required to pay Specialty Med for DME issued without a license and is entitled to restitution for payments it was induced to make.

## VII.   FALSIFIED AND FABRICATED MEDICAL SUBMISSIONS

102.   The defendants routinely invented symptoms to create the false appearance of medical necessity for their alleged procedures.

103.   In order to bill for vestibular function testing and other tests related to possible brain injuries, Specialty Med claimed to find symptoms related to patients'

cognition, nervous system, or brain function such as dizziness, nausea, memory loss, and mental fog that were not reported by other providers and did not actually exist.

104.   For example, R.H. (Claim No. 051915790) was evaluated at Garden City Hospital, including with x-rays and CT scans, and by her primary care physician.

105.   R.H. was diagnosed by these providers with only a neck muscle strain and back pain and her primary care physician specifically found "no Neuro[logical injury] signs."

106.   When R.H. later presented to Specialty Med, it made false claims that R.H. had symptoms such as headache, anxiety, dizziness, and nausea so that it could bill for unnecessary "neurocognitive" tests.

107.   Specialty Med had R.H. complete a chart documenting her pain complaints, and she checked her lower back, upper back, left knee, and neck, but not her head, further evidencing that symptoms were fabricated by Specialty Med.

108.   Similarly, M.G. (Claim No. 050948367) was evaluated at Oakwood Hospital and Medical Center following an alleged accident and was noted to be alert and oriented, not dizzy, not confused, not lightheaded, had no headache, and had no evidence of severe head trauma or brain bleed.

109.   Almost six (6) months later, Specialty Med purported to diagnose M.G. with cognitive dysfunction related to his alleged injuries so severe that he was in the

bottom one percent (1%) for cognitive processing speed, executive function, visual attention, cognitive flexibility, and delayed recall, with "no indication of malingering."

110.   These false diagnoses were made by Specialty Med even though M.G. was actively working as a pharmacy tech.

111.   M.G. was also evaluated by another physician just one (1) week prior to the alleged cognitive testing by Specialty Med, and that physician stated that M.G. did not have any concerning neurological or psychological symptoms, and that he did not have any "memory impairment."

112.   Pribil and MedSpecialists made similarly false findings and diagnoses intended to create the appearance of medical necessity for alleged surgeries billed by MedSpecialists.

113.   For example, MedSpecialists claimed that J.M. (Claim No. 041429321) had "severe stenosis" at levels L4-5 and L5-S1, a severe osteophyte complex, facet hypertrophy, and a "disc herniation in the neural foramen compressing exiting nerve roots."

114.   A CT scan of J.M.'s lumbar spine ordered by Pribil himself and taken less than a month earlier found only "mild" canal stenosis, minimal osteophytes, and no disc herniation at either of these levels.

115.   Similarly, during an alleged surgery on patient A.B. (Claim No. 046099794), Pribil purported to find a "disc herniation with severe compression of both neural foramina" at levels C4-5 and C5-6.

116.   This is contradicted by an MRI that showed no herniation at C4-5 with only mild stenosis and a herniation at C5-6 with only mild neural foraminal narrowing.

117.   These and other misrepresentations were made by the defendants intentionally to create the false appearance of medical necessity for testing, procedures, and surgery that were not needed and, if they were performed at all, were done solely to generate fraudulent bills.

## VIII. <u>UNREASONABLE AND UNNECESSARY FRAUDULENT TREATMENT</u>

118.   The defendants' goal was to bill for as much treatment as possible, regardless of whether such treatment was reasonably necessary to patients' care, recovery, rehabilitation, and/or arose out of an alleged motor vehicle accident, in order to generate bills to Liberty Mutual.

119.   The defendants' purported treatment also violated standards of care in the medical community, as services were not indicated, redundant, excessive, and repeated without any benefit to patients.

120.   The full extent of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment they billed was not known to Liberty

Mutual until it undertook the full investigation that culminated in the filing of this action.

121.   The unnecessary treatment billed by the defendants, discussed more fully below, includes the treatment and patients set out in the charts annexed hereto at Exhibits 1 through 3.

122.   All of the claims submitted by the defendants to Liberty Mutual through the U.S. Mail seeking payment for unnecessary, excessive, unlawful, and unreasonable treatment are fraudulent.

123.   Liberty Mutual is not required to pay the defendants for treatment that was medically unnecessary, and it is entitled to the return of money paid as a result of the defendants' fraud.

124.   None of the facts set out in the section above were known to Liberty Mutual until it undertook its investigation that resulted in the commencement of this action and are not evident within the four corners of the medical records and bills submitted to Liberty Mutual by the defendants.

### A.   MEDICALLY UNNECESSARY SPINAL SURGERIES

125.   The largest fraudulent bills submitted by the defendants were MedSpecialists's bills for alleged surgeries by Pribil that were medically unnecessary.

126.   Not only were these surgeries unnecessary, if they were performed at all, the already excessive charges for these alleged procedures were multiplied by including charges for unnecessary assistant surgeons and through fraudulent double billing.

127.   As explained above, Pribil exaggerated findings to justify unnecessary surgeries.

128.   In J.M.'s (Claim No. 041429321) case, MedSpecialists's alleged surgery was billed almost two (2) years after the alleged accident that supposedly necessitated it.

129.   Pribil's primary diagnosis of lumbar radiculopathy had been ruled out by electrodiagnostic testing by another physician a year prior.

130.   Further, J.M. was reporting only moderate pain scores of five (5) and six (6) out of ten (10) just prior to the alleged surgery, and less invasive interventions had not yet been attempted such as steroid injections or facet injections, which would have been the standard of care for a patient with persistent back pain.

131.   A.B.'s (Claim No. 046099794) alleged surgery was billed more than a year after her alleged accident and the defendants did not first attempt any epidural steroid injections despite Pribil diagnosing her with a disc herniation, as should have been done before resorting to a surgical discectomy and spinal fusion.

132.   A.B. was also a risky candidate for surgery who had been taking various narcotics since her alleged accident and was being monitored for possible addiction.

133.   After her alleged surgery by Pribil, A.B. woke up from anesthesia but subsequently lost consciousness and was unresponsive to painful stimulus, had to be given Narcan, and was transported to Beaumont Hospital for emergency care.

134.   In yet another example, the defendants billed for two (2) alleged surgeries to patient C.W. (Claim No. 049045600).

135.   C.W. was allegedly involved in a minor accident on March 25, 2022. Her vehicle suffered only minor damage, and C.W. refused an ambulance and emergency treatment.

136.   Three (3) months later, MedSpecialists billed for a total disc replacement in C.W.'s cervical spine without first attempting or even recommending any less invasive procedures that should have been tried prior to surgery.

137.   After the alleged disc replacement, MedSpecialists repeatedly claimed that C.W. was "doing great" and that the alleged surgery had "excellent results."

138.   In fact, C.W. was reporting to her other physicians that she had pain radiating down her right arm that started after the alleged surgery.

139.   Five (5) months after the first alleged surgery to C.W., Specialty Med billed for a second surgery that was also allegedly done by Pribil.

140.   Pribil had recommended experimental bone marrow stem cell injections for C.W.'s elbow, shoulder, and lower back, but, without any explanation or prior recommendation, Specialty Med also billed for a disc fusion and implanting hardware at the same cervical levels where MedSpecialists previously billed for a total disc replacement.

141.   A patient should not typically need both a total disc replacement and a disc fusion, yet the defendants never explained why C.W. needed both surgeries at the same spinal levels, nor did they ever acknowledge or address the new pain experienced by C.W. after the first alleged surgery.

142.   Several weeks later, Pribil claimed the experimental stem cell injections had been a success and that C.W. was still recovering from her total disc replacement (the alleged surgery in July), but made no mention whatsoever of the much more recent alleged disc fusion, which suggests this inexplicable surgery was not performed at all.

**B.   EXCESSIVE AND UNNECESSARY SHOCKWAVE THERAPY**

143.   The defendants billed for allegedly subjecting patients to experimental extracorporeal shock wave therapy ("ESWT") that was not medically necessary, unhelpful, and excessive.

144.   This medically unnecessary treatment was always billed by defendant Specialty Med.

145.   ESWT involves the application of high-energy acoustic waves to a patient's skin to supposedly break down tissue and promote healing and repair.

146.   The mechanism of ESWT treatment is a machine that uses compressed air to accelerate a projectile up to 80 to 90 kph within a guiding tube that strikes a metal applicator placed on the patient's skin.

147.   ESWT first emerged in the 1980s as a noninvasive treatment known as lithotripsy used exclusively to eliminate kidney stones.

148.   The application of ESWT is only approved by the United States Food and Drug Administration ("FDA") for two specific types of musculoskeletal injury: (1) lateral epicondylitis (commonly known as tennis elbow) and (2) chronic plantar fasciitis, neither of which are acute injuries that may be sustained in a motor vehicle accident.

149.   The defendants never billed for ESWT as a treatment for either FDA-approved condition, but rather billed for using it as an unproven treatment for alleged back and neck pain.

150.   The federal government has deemed ESWT to be medically unnecessary as a purported treatment for back and neck pain, or any other musculoskeletal injury, stating that ESWT is "not reasonable and necessary for the treatment of musculoskeletal conditions," because "[t]he available evidence

suggests that further research is needed to establish the efficacy and safety of high energy ESWT in the treatment of musculoskeletal conditions."

151.  Not only was the defendants' application of ESWT medically unnecessary, it was also billed excessively.

152.  The defendants billed for repeated applications of ESWT even when acknowledging that patients realized no benefit from the alleged treatments.

153.  For example, Specialty Med billed for four (4) separate applications of ESWT to D.B. (Claim No. 052545611) in March 2023.

154.  D.B. reported pain that was rated a seven (7) out of ten (10) on February 17, 2023.  On March 31, 2023, after all four (4) billed ESWT treatments, Specialty Med's submissions stated that D.B.'s pain was still seven (7) out of ten (10), meaning the alleged treatment had no impact whatsoever.

155.  Similarly, the defendants billed for alleged ESWT to S.C. (Claim No. 050276053) on seven (7) dates from November 2022 through March 2023 despite that her initial pain score was only four (4) out of ten (10), and despite failing to record any improvement during this period of treatment.

### C.  EXCESSIVE AND UNNECESSARY COGNITIVE AND VESTIBULAR FUNCTION TESTING

156.  Specialty Med billed for alleged cognitive and vestibular function testing that was not medically necessary and based on invented or exaggerated symptoms.

157.    Specialty Med also billed for related "videonystagmograms" that purported to identify nervous system problems or vestibular problems allegedly caused by traumatic injury.

158.    To justify these tests, Specialty Med claimed that patients were experiencing some form of vertigo after their alleged accident.

159.    There is little evidence that vertigo can be caused by a whiplash injury alone; therefore, these purported tests could only be medically necessary if there was a documented head injury, associated vertigo or imbalance, and a documented inability to diagnose the source of that vertigo or imbalance.

160.    As explained *supra*, while Specialty Med attempted to create the appearance of the existence of these symptoms, evidence from contemporaneous records of other providers confirms that they were fabricated by Specialty Med.

161.    These tests were billed for thousands of dollars but never resulted in any tangible benefit or change to treatment based on their results.

162.     For example, these tests always found "probable" nervous system damage that led to recommendations for brain MRIs, but the MRIs did not actually take place.

163.    For example, M.G. (Claim No. 050948367) was diagnosed by Specialty Med with what amounted to severe brain damage, but other providers' records show that this diagnosis was false.

164.   Based on its fraudulent testing, including a videonystagmogram, Specialty Med recommended that M.G. have a brain MRI and a "full Neuropyschological evaluation," but M.G. never had such testing and the defendants never billed for any treatment to M.G. based on the purported test results.

165.   Similarly, R.H. (Claim No. 051915790) was allegedly subjected to vestibular function and cognitive testing based on false symptoms of dizziness and nausea that R.H. did not report to her other providers, including her primary care physician.

166.   Specialty Med purported to find "possible but unconfirmed CNS [central nervous system] involvement" in her non-existent vertigo.

167.   Specialty Med recommended a brain MRI and a full evaluation by a neurologist, neither of which occurred, which further evidences that these expensive tests were ordered simply to generate additional charges to Liberty Mutual.

### D.   EXCESSIVE AND UNNECESSARY COMPUTERIZED RANGE OF MOTION TESTING

168.   Not only did SpineMD bill for far more units of ROM testing than it provided, as detailed above, the alleged tests were also medically unnecessary and, in fact, unused.

169.   When performed properly, ROM and muscle testing are used to assess baseline levels (1) to guide clinic plans and (2) to gauge improvement over the course of treatment.

170.   This type of testing is nearly always performed by a practitioner without the need for expensive equipment or diagnostic testing.

171.   SpineMD claimed to perform "objective, computerized" testing to generate treatment plans and gauge improvement, but the purported results were not actually used for either purpose.

172.   The defendants' "treatment plans" concerning ROM and muscle strength were nothing more than prescriptions for physical therapy.

173.   The physical therapists and chiropractors to whom the defendants' patients were sent did not even acknowledge the existence of these alleged tests let alone develop treatment plans based on them.

174.   When the defendants billed for re-testing ROM and muscle strength, purportedly to gauge improvement, these alleged tests also went unacknowledged by other providers who made no changes to their treatment plans.

175.   The failure to use the supposed test results is particularly egregious because the defendants often (falsely) purported to find substantial deficits.

176.   The purported deficits found by the defendants' unnecessary and improper testing were contradicted by the contemporaneous records of other providers, and sometimes by the defendants themselves.

177.   For example, C.M. (Claim No. 050698998) was allegedly evaluated by Specialty Med on September 9, 2022 and reported his pain as only a two (2) out of ten (10).

178.   Griesser claimed that he performed a manual muscle test and that C.M. scored five (5) out of five (5).

179.   Despite this low pain score and normal muscle exam, SpineMD billed for a computerized ROM and muscle testing that same day and purported to find both strength and ROM deficits (at a cost of $5,925).

180.   The defendants never provided any treatment to C.M. based on the supposed test findings nor based on findings from a repeat of the same test billed two (2) months later at the same excessive price.

181.   Griesser referred C.M. to Infinity Physical Therapy, which, despite creating goals related to muscle strength and range of motion and actively tracking C.M.'s progress, never even acknowledged the existence of the computerized tests that were billed for more than $10,000 and did not adjust its treatment plans.

182.   Similarly, patient R.P. (Claim No. 047616706) was allegedly subjected to three (3) separate computerized ROM and muscle tests, but her physical therapist never once acknowledged the existence of these tests and never altered the course of treatments.

E.    **MEDICALLY UNNECESSARY BONE MARROW HARVESTING AND STEM CELL THERAPY**

183.    Specialty Med billed for experimental bone marrow aspirate concentrate ("BMAC") therapy at exorbitant prices, again because it is not subject to the limits of Michigan's No-Fault fee schedule.

184.    BMAC therapy extracts involves harvesting bone marrow material from a patient's iliac crest and injecting the material into joint spaces.

185.    When properly performed, BMAC involves manipulation of the harvested bone marrow material in a centrifuge to create a concentrate that provides the hypothesized therapeutic benefit.

186.    BMAC injections are an investigational procedure that is effectively unregulated by the FDA as long as it uses the patient's own bone marrow, and which is deemed medically unnecessary by the federal government and most insurers for back, neck, and shoulder pain, because of a lack of evidence that it provides measurable benefits.

187.    Not only did Specialty Med bill exorbitant prices for this experimental and unproven procedure, but it also failed to perform the procedure correctly.

188.    For example, Specialty Med billed $50,079 for alleged bone marrow aspiration, processing, and injection into the shoulder of patient W.G. (Claim No. 043748662) on January 10, 2023.

189.   This procedure was allegedly performed by Oppenheimer, but the operative note does not describe any manipulation of the harvested bone marrow in a centrifuge, which is a necessary part of the experimental therapy.

190.   According to Oppenheimer's narrative description, he evidently extracted bone marrow and simply reinjected it into W.G's shoulder.

191.   A BMAC injection typically requires about two (2) hours to complete. Most of that time is used to process the bone marrow because it requires a long time in the centrifuge.

192.   Oppenheimer failed to record how much time the alleged BMAC procedure took, but anesthesia records submitted by the anesthesia provider indicate that W.G. was only sedated for thirty-five (35) minutes.  This is not enough time to properly process the bone marrow.

193.   Specialty Med also billed $33,425 for another unproven treatment to R.P.'s (Claim No. 047616706) lower back on October 18, 2022.

194.   This was an alleged platelet rich plasma injection to R.P.'s lower back, also allegedly done by Oppenheimer.

195.   Platelet rich plasma injections are also deemed not medically necessary by the federal government for musculoskeletal pain such as R.P.'s alleged lumbar pain, due to a lack of evidence that it improves patient outcomes.

196.  Finally, and as explained in more detail *infra*, Specialty Med fraudulently increased its charges for these unnecessary procedures by double billing for already included components such as fluoroscopy.

## IX.  **FRAUDULENT BILLING PRACTICES**

197.  Providers like the defendants have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

198.  The defendants failed to meet this responsibility and instead submitted bills at unreasonable charges to Liberty Mutual for medically unnecessary and excessive services and used fraudulent billing practices, as discussed *infra*.

199.  All of the medical records, bills, and invoices submitted to Liberty Mutual by the defendants utilized CPT and Healthcare Common Procedure Coding System ("HCPCS") codes.

200.  By utilizing CPT and HCPCS codes to bill Liberty Mutual, the defendants represented that the services they billed for corresponded to and were accurately described by the definitions for the CPT and HCPCS codes they utilized.

201.  The defendants intended that Liberty Mutual interpret the bills they submitted using the definitions ascribed to and guidelines applicable to the CPT and HCPCS codes that the defendants chose to use.

202.   The defendants never communicated to Liberty Mutual that they did not intend for their bills to be interpreted using anything other than the published meanings ascribed to and guidelines applicable to the CPT and HCPCS codes that they chose to use.

203.   Liberty Mutual reasonably relied on the defendants' utilization of CPT and HCPCS codes to accurately report the services they rendered to Liberty Mutual insureds.

204.   The vast majority of the bills submitted to Liberty Mutual by the defendants were submitted on Health Insurance Claim Forms ("HICF") approved by the National Uniform Claim Committee ("NUCC") and referenced in the NUCC Instruction Manual.

205.   The back of all HICF forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

206.   Despite the warning on the back of the HICF forms, the defendants included false, incomplete, and misleading information in the bills and medical records submitted to Liberty Mutual through the U.S. Mail.

207.   The defendants also used the following fraudulent billing practices to further inflate charges to Liberty Mutual.

35

### A.    FRAUDULENT UPCODING

208.    As discussed above, the defendants made misrepresentations to Liberty Mutual by submitting documentation that included CPT codes for medical services that (1) were not actually performed, (2) were unlicensed and unlawful, (3) were not performed consistent with established standards of care, and (4) were wholly unwarranted and unnecessary.

209.    The billing codes submitted to Liberty Mutual by the defendants consistently exaggerated the complexity of evaluations purportedly rendered in order to inflate the charges submitted to Liberty Mutual.

210.    Physician examinations of patients are billed using CPT codes that reflect the complexity involved in the examination and it is the responsibility of the provider to select the appropriate CPT code for the complexity involved in the examination.

211.    There are four (4) levels at which an office visit/examination or office consultation can be billed.

212.    Initial office visits/examinations are billed using a CPT code that starts with the numbers "9920"; reexaminations are billed using a CPT code that starts with the numbers "9921"; and consultations are billed using a CPT code that starts with the numbers "9924."

213.  The final number to complete each five-digit CPT code for examinations and consultations is two (2) through five (5), depending on the complexity of the evaluation performed.  A level five (5) is the most complex, and level two (2) is the least complex.

214.  To properly bill using level 5 complexity codes, the physician must have taken a comprehensive history, performed a comprehensive examination, and engaged in medical decision-making of high complexity.

215.  To properly bill using level 4 complexity codes, the physician must have taken a comprehensive (initial encounter) or detailed (reevaluation) history, performed a comprehensive (initial encounter) or detailed (reevaluation) examination, and engaged in medical decision-making of moderate complexity.

216.  The AMA has guided that level 5 initial examinations should involve approximately 60 minutes of face-to-face time with the patient, and level 5 reexaminations should involve approximately 40 minutes of face-to-face time with the patient.

217.  Level 4 examinations typically involve 45 minutes of face-to-face time, and level 4 reexaminations typically involve 25 minutes of face-to-face time.

218.  To warrant a medical bill demanding payment for a level 4 examination, the injury/condition necessarily requires: moderate risk of mortality, morbidity and/or complications; moderate diagnoses and review of complex data;

37

and requires the medical provider to: (1) obtain comprehensive patient histories; (2) conduct comprehensive examinations; and (3) evaluate the patient (face-to-face) in an interaction lasting approximately 45 minutes.

219.   The amount billed for an evaluation will vary depending on the complexity of the evaluation performed, with a higher amount charged for a higher complexity evaluation than for a low complexity evaluation.

220.   Since the defendants began billing Liberty Mutual in 2021, every patient examination charge they billed to Liberty Mutual was for a level 4 or a level 5 examination.  *See* Exhibits 1 and 3.

221.   Every initial evaluation except one was billed as a level 5 examination. Id.

222.   Follow up examinations were almost always billed as level 4 examinations.  Id.

223.   The defendants' examinations consistently fell far short of meeting the threshold standard to bill for level 4 and level 5 encounters.

224.   Many of the examinations involved only perfunctory histories or examinations, and some lacked these entirely.

225.   MedSpecialists routinely billed for purported level 4 examinations by Pribil that resulted in nothing more than a single paragraph note with no indication that any physical examination was performed at all.

226.  The defendants engaged in this improper and fraudulent upcoding in order to increase the amount billed to Liberty Mutual for patient appointments.

227.  By creating medical bills that included CPT codes for office visits and then causing such bills to be mailed to Liberty Mutual, the defendants represented to Liberty Mutual that the billed medical services had been performed in conformity with the AMA's CPT code guidelines.

228.  The bills prepared and mailed by these defendants were submitted using fraudulent and deceptive CPT codes representing patient encounters that did not actually occur as billed.

## B.  FRAUDULENT MULTIPLE BILLING

229.  The defendants routinely double billed alleged services to Liberty Mutual, which resulted in many thousands of dollars in fraudulent bills.

230.  For every disc replacement surgery billed by MedSpecialists, the defendants submitted separate bills for the alleged disc replacement, discectomy, fluoroscopy, and use of a microscope.

231.  The CPT codes used by MedSpecialists to bill for disc replacements (22856 and 22858) expressly include the performance of discectomies.

232.  A discectomy is the removal of some or all of an intervertebral disc, which is obviously a necessary component of replacing an intervertebral disc.

233.   Thus, every time MedSpecialists billed Liberty Mutual using a separate CPT code for a discectomy in conjunction with a disc replacement, it sought payment for a service that was already covered by a different bill, which constitutes fraudulent double billing.

234.   The AMA coding guidelines unequivocally state that the code used by MedSpecialists to bill for discectomies (63075) is never to be billed in conjunction with disc replacement CPT codes such as 22856 and 22858.

235.   Similarly, performance of fluoroscopy and use of an operating microscope are included in the charges for disc replacements and discectomies. They are never properly billed as separate charges in addition to those procedures.

236.   In other words, of these four (4) separate charges submitted by MedSpecialists in relation to every purported cervical spine surgery at issue herein, only one (1) charge could ever have been proper.

237.   MedSpecialists also submitted bills for purported lumbar spine surgeries that fraudulently included separate charges for fluoroscopy and purported use of a microscope that were already included in the charge for the surgery itself.

238.   These double billed items multiplied the amount of MedSpecialists's already exorbitant charges.

239.   MedSpecialists typically charged $64,745 for a cervical total disc replacement.  Of that amount, only $25,350 could possibly have been charged

properly (if the procedures were medically necessary and appropriate, which they were not for the reasons discussed in the preceding sections). The other $39,395 was for fraudulent double billing and an unnecessary assistant surgeon (explained more fully *supra*).

### C.      IMPROPER BILLING DURING GLOBAL SURGERY PERIODS

240.   Billing regulations provide that the cost of many of the injections and procedures billed by the defendants include all necessary services furnished before, during, and after a procedure, in what is referred to as the "global surgery package."

241. Post-surgery services include subsequent evaluations and pain management related to the surgery.

242.   Periods during which post-surgery services are included in the cost of the procedure vary based on the procedure performed but are generally either ten (10) days for relatively minor procedures or 90 days for surgeries.

243.   For procedures that include a 90-day global surgery package, the global period includes the day prior to the surgery, the day of the surgery, and 90 days following the surgery.

244.   Even when there is no post-surgery period applicable to a procedure, services performed on the date of a procedure are generally not payable as a separate service.

245. MedSpecialists and Specialty Med both improperly charged for examinations billed within global surgery periods. *See* Exhibits 1 and 3.

## X. <u>EXCESSIVE AND UNREASONABLE CHARGES</u>

246. Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." Mich. Comp. Laws § 500.3107(1)(a).

247. The defendants routinely billed Liberty Mutual at rates that were unreasonable and had no relation to the services allegedly performed.

248. In each such case, including those described in the following sections, Liberty Mutual was harmed when it was induced to pay the unreasonable amounts billed by the defendants.

249. Liberty Mutual also was harmed even when it did not pay the unreasonable and excessive amounts charged by the defendants, because it was nevertheless obligated to investigate and adjust each claim, thereby incurring costs.

250. By way of example, according to Healthcare Bluebook (which compiles data on medical costs to assist patients), the average cost for a total disc replacement surgery in the Detroit region was $25,819 in 2022.

251. This is an all-inclusive number that represents the surgeon's professional fee, all facility fees, anesthesia services, and any other ancillary services.

252. MedSpecialists charged Liberty Mutual $64,745 for total disc replacements, which represents only the professional fee portion. The facility fees associated with these alleged surgeries were even higher.

253. For example, MedSpecialists charged $64,745 for a total disc replacement to patient W.G. (Claim No. 043748662) on February 14, 2023, but the rest of the facility fees from Advanced Surgery Center (which is affiliated with the defendants) were $246,459 for a total of $311,204. This is an order of magnitude greater than the usual and customary charges for a total disc replacement.

254. As another example, most providers that advertise ESWT treatment charge between $200 and $400 per treatment. Specialty Med billed Liberty Mutual between $1,328.25 and $2,830.40 for ESWT in No-Fault claims, which is clearly excessive.

255. Specialty Med also frequently billed multiple units of ESWT on a single date of service, and on at least one date billed Liberty Mutual $11,321.60 for alleged ESWT to one patient.

256. These outrageous and uncustomary prices were charged by the defendants to fraudulently increase their profits at the expense of Liberty Mutual,

and also increase the perceived value of their accounts receivable that they sold to factoring companies for quick cash based on a percentage of the face value of the bill.

257.   These factoring companies then attempted to recover the full face value of the outrageous charges from Liberty Mutual after having bought the accounts from the defendants for pennies on the dollar.

## XI.   MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY LIBERTY MUTUAL

### A.   MISREPRESENTATIONS BY THE DEFENDANTS

258.   To induce Liberty Mutual to pay promptly their fraudulent charges, the defendants submitted and caused to be submitted to Liberty Mutual false documentation that materially misrepresented that the services they billed were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, that all treatment was actually rendered, and that all treatment was rendered lawfully.

259.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." Mich. Comp. Laws § 500.3107(1)(a).

260.   Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]."  Mich. Comp. Laws § 500.3157(1).

261.   Thus, every time the defendants submitted bills and medical records to Liberty Mutual supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to treatment that was lawfully and actually rendered and necessary for their patients' care, recovery, or rehabilitation.

262.   There are no less than eleven (11) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Liberty Mutual:

   a.   The defendants billed Liberty Mutual for treatment and services that were not actually provided;

   b.   The defendants fabricated, falsified, and exaggerated diagnoses to create the appearance of medical justification for the services for which they billed Liberty Mutual;

   c.   MedSpecialists billed for excessive and medically unnecessary alleged surgeries that were performed, if at all, before any less invasive therapies were attempted;

   d.   Specialty Med billed for unnecessary, unproven, and excessive shockwave therapy;

   e.   Specialty Med billed for medically unnecessary vestibular and cognitive function testing to patients who had no head injuries and no symptoms of vertigo;

f.     SpineMD billed for medically unnecessary and excessive computerized range of motion and muscle testing that was not used for any purpose other than to generate bills;

g.     Specialty Med billed for unnecessary and unproven bone marrow aspiration and stem cell injections that are not FDA-approved;

h.     Specialty Med and MedSpecialists submitted claims representing that purported patient encounters were more complex than they actually were, which is a fraudulent billing practice known as upcoding;

i.     MedSpecialists submitted claims using multiple CPT codes to describe the same services allegedly performed thereby fraudulently increasing its bills;

j.     Specialty Med and MedSpecialists submitted separate and additional bills for services included in global surgery packages; and

k.     The defendants submitted bills at rates that had no basis and were many times higher than reasonable to charge for services, if such services were rendered at all.

263.   As detailed *supra*, the defendants frequently violated standards of care, treated excessively, and billed for treatment without basis or adequate substantiation.

264.   If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary.

265.   The foregoing facts – including billing for services not rendered, billing without a license, using a predetermined treatment protocol to inflate charges, misrepresenting the necessity of treatment and testing, and using fraudulent billing practices – were not, and could not have been, known to Liberty Mutual until it commenced its investigation of the defendants shortly before the filing of this action.

266.   The prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment and testing billed by the defendants unnecessary and unlawful.

267.   The fact of unnecessary treatment is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed at Exhibits 1 through 3.

268.   Thus, each claim for payment (and accompanying medical submissions) under Michigan's No-Fault Act mailed to Liberty Mutual by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

269.   Moreover, each HICF submitted to Liberty Mutual by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

270.   Through the submission of patient records, invoices, HICFs, and other medical documentation to Liberty Mutual via the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the visits, examinations, testing, procedures, DME, and ancillary services for which they billed Liberty Mutual.

47

271.   As the defendants did not render actual, lawful, and reasonably necessary medical treatment and testing, and misrepresented the treatment and testing purportedly performed, each bill and accompanying documentation mailed by or on behalf of the defendants to Liberty Mutual constitutes a material misrepresentation.

### B.   LIBERTY MUTUAL'S JUSTIFIABLE RELIANCE

272.   The documents submitted to Liberty Mutual by the defendants were designed to, and did in fact, induce Liberty Mutual to rely on the documents.

273.   At all relevant times, the defendants concealed from Liberty Mutual facts regarding the fact, lawfulness, and medical necessity of services allegedly provided by them to prevent Liberty Mutual from discovering that the claims submitted by and on behalf of the defendants were not compensable under the No-Fault Act.

274.   These misrepresentations include submitting false medical documentation, including HICFs, documenting the fact, lawfulness, and necessity of medical treatment, testing, and services in order to seek payment under Michigan's No-Fault Act.

275.   Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after Liberty Mutual began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

276.   Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, Liberty Mutual did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

277.   As a result of the defendants' misrepresentations, Liberty Mutual paid money to the defendants to its detriment.

278.   Liberty Mutual would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services billed.

## XII.   **MAIL FRAUD RACKETEERING ACTIVITY**

279.   As discussed above, the referrals, treatment, DME, testing, and services billed by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

280.   The objective of the scheme to defraud Liberty Mutual, which occurred throughout the period set out in Exhibits 1 through 3, was to collect No-Fault benefits to which the defendants were not entitled because the medical services provided, if at all, were not necessary and were not actually and lawfully rendered, were fraudulently billed, and were billed at excessive and unreasonable amounts.

281.   This objective necessarily required the submission of bills for payment to Liberty Mutual.

282.   The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service.

283.   All documents, medical records, notes, reports, HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

284.   Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim and insurance payments.

285.   Every payment at issue in this Complaint where Liberty Mutual was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Liberty Mutual using the U.S. Mail.

286.   The fraudulent medical billing scheme detailed herein generated numerous mailings.

287.   A chart highlighting representative examples of mail fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 4.

288.   As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Liberty Mutual via the U.S. Mail related to each exemplar patient discussed in this Complaint.

289. It was within the ordinary course of business for the defendants to submit claims for No-Fault payment to insurance carriers like Liberty Mutual through the U.S. Mail.

290. Moreover, each of the defendants is in the business of billing for medical services by fraudulently seeking payment to which each defendant is not entitled through the use of fraudulent communications sent via the U.S. Mail.

291. In other words, discrete (claim- and patient-specific) instances of mail fraud are a regular way of doing business for each of the defendants.

292. The defendants, at the direction and with the knowledge of their owners and managers, continue to submit claims for payment to Liberty Mutual and, in some instances, continue to commence litigation against Liberty Mutual seeking to collect on unpaid claims.

293. Thus, the defendants' commission of mail fraud continues.

294. As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Liberty Mutual by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

295. Liberty Mutual reasonably relied on the submissions it received from the defendants, including the submissions set out in Exhibits 1 through 4 annexed hereto and identified in the exemplar patients above.

296.   As the defendants agreed to pursue the same criminal objective (namely, mail fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Liberty Mutual's damages.

## XIII.  **DAMAGES**

297.   The wrongful conduct by the defendants injured Liberty Mutual in its business and property by reason of the aforesaid violations of law.

298.   For the reasons set forth in this Complaint, Liberty Mutual seeks compensatory damages against the defendants for the amounts it has paid to them and paid because of their conduct.

299.   Every payment claimed by Liberty Mutual as damages was made by Liberty Mutual alone.

300.   Moreover, every payment made by Liberty Mutual derives from a check sent by Liberty Mutual through the U.S. Mail.

301.   As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only mailed medical records and bills for the purpose of having Liberty Mutual rely on such documents and mail payment in response thereto.

302.   Liberty Mutual also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed by the

defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

303.   Liberty Mutual investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

304.   Finally, Liberty Mutual also seeks declaratory relief that no previously-denied and pending claims submitted to it by the defendants are compensable.

305.   The defendants have submitted hundreds of thousands of dollars of fraudulent bills to Liberty Mutual.

## XIV.   CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Specialty Med Enterprise)
### Against SpineMD of Michigan PLLC and MedSpecialists of Michigan, Professional Limited Liability Company

306.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 305 set forth above as if fully set forth herein.

307.   Specialty Med constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

308.   In connection with each of the claims identified in the within Complaint, defendants SpineMD and MedSpecialists ("Count I defendants") intentionally caused to be prepared and mailed false medical documentation by

Specialty Med, or knew that such false medical documentation would be mailed in the ordinary course of Specialty Med's business, or should have reasonably foreseen that the mailing of such false medical documentation by Specialty Med would occur, in furtherance of the Count I defendants' scheme to defraud.

309.   The Count I defendants knew that two (2) or more mailings would be sent to demand and receive payment from Liberty Mutual on certain dates, including those mailings identified in the chart annexed hereto at Exhibit 4.

310.   As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Liberty Mutual for medical services that were purportedly performed by Specialty Med, which they knew would be billed by Specialty Med, in order to collect payment from Liberty Mutual under applicable provisions of the Michigan No-Fault Act.

311.   SpineMD and MedSpecialists had patient referral arrangements with Specialty Med, shared the primary business address used by Specialty Med to allegedly evaluate and treat patients, were owned, operated and conducted by the same set of physicians as Specialty Med, and performed tests and procedures on Specialty Med patients to create the appearance they were more injured than they were, all of which allowed Specialty Med to continue billing Liberty Mutual.

312.   The Count I defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Specialty Med to continue billing for medically unnecessary services.

313.   As a result of, and in reasonable reliance on, these misleading documents and representations, Liberty Mutual, by its agents and employees, issued payment drafts to Specialty Med for the benefit of the Count I defendants that would not otherwise have been paid.

314.   The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

315.   By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**<u>COUNT II</u>**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Specialty Med Enterprise)**
**Against SpineMD of Michigan PLLC and MedSpecialists of Michigan,**
**Professional Limited Liability Company**

316.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 305 set forth above as if fully set forth herein.

317.   Defendants SpineMD and MedSpecialists ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Specialty Med.

318.   The Count II defendants each agreed to further, facilitate, support, and operate the Specialty Med enterprise.

319.   As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

320.   The purpose of the conspiracy was to obtain insurance payments from Liberty Mutual on behalf of Specialty Med even though Specialty Med was not eligible to collect such payments by virtue of its unlawful conduct.

321.   The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Liberty Mutual of insurance claim and medical documents containing material misrepresentations.

322.   Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make insurance payments as a result of the Count II defendants' unlawful conduct described herein.

323.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Liberty Mutual and Liberty Mutual is

entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT III**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(SpineMD Enterprise)**
**Against Specialty Medical Center, Inc. and MedSpecialists of Michigan,**
**Professional Limited Liability Company**

324.    Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 305 set forth above as if fully set forth herein.

325.    SpineMD constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

326.   In connection with each of the claims identified in the within Complaint, defendants Specialty Med and MedSpecialists ("Count III defendants") intentionally caused to be prepared and mailed false medical documentation by SpineMD, or knew that such false medical documentation would be mailed in the ordinary course of SpineMD's business, or should have reasonably foreseen that the mailing of such false medical documentation by SpineMD would occur, in furtherance of the Count III defendants' scheme to defraud.

327.    The Count III defendants knew that two (2) or more mailings would be sent to demand and receive payment from Liberty Mutual on certain dates, including those mailings identified in the chart annexed hereto at Exhibit 4.

328.    As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Liberty Mutual for medical services that were purportedly performed by SpineMD, which they knew would be billed by SpineMD, in order to collect payment from Liberty Mutual under applicable provisions of the Michigan No-Fault Act.

329.    Specialty Med and Med Specialists referred patients to SpineMD for medically unnecessary testing, shared the primary business address used to allegedly evaluate and treat patients, and were owned, operated and conducted by the same set of physicians.

330.    The Count III defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted SpineMD to continue billing for medically unnecessary services.

331.    As a result of, and in reasonable reliance on, these misleading documents and representations, Liberty Mutual, by its agents and employees, issued

payment drafts to SpineMD for the benefit of the Count III defendants that would not otherwise have been paid.

332.   The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

333.   By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT IV**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(SpineMD Enterprise)**
**Against Specialty Medical Center, Inc. and MedSpecialists of Michigan,**
**Professional Limited Liability Company**

334.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 305 set forth above as if fully set forth herein.

335.   Defendants Specialty Med and MedSpecialists ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of SpineMD.

336.   The Count IV defendants each agreed to further, facilitate, support, and operate the SpineMD enterprise.

337.   As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

338.   The purpose of the conspiracy was to obtain insurance payments from Liberty Mutual on behalf of SpineMD even though SpineMD was not eligible to collect such payments by virtue of its unlawful conduct.

339.   The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Liberty Mutual of insurance claim and medical documents containing material misrepresentations.

340.   Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make insurance payments as a result of the Count IV defendants' unlawful conduct described herein.

341.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Liberty Mutual and Liberty Mutual is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
## VIOLATION OF 18 U.S.C. § 1962(c)
## (MedSpecialists Enterprise)
## Against Specialty Medical Center, Inc. and SpineMD of Michigan PLLC

342.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 305 set forth above as if fully set forth herein.

343.   MedSpecialists constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

344.   In connection with each of the claims identified in the within Complaint, defendants Specialty Med and SpineMD ("Count V defendants") intentionally caused to be prepared and mailed false medical documentation by MedSpecialists, or knew that such false medical documentation would be mailed in the ordinary course of MedSpecialists's business, or should have reasonably foreseen that the mailing of such false medical documentation by MedSpecialists would occur, in furtherance of the Count V defendants' scheme to defraud.

345.   The Count V defendants knew that two (2) or more mailings would be sent to demand and receive payment from Liberty Mutual on certain dates, including those mailings identified in the chart annexed hereto at Exhibit 4.

346.   As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Liberty Mutual for medical services that were purportedly performed by MedSpecialists, which they knew would be billed by MedSpecialists, in order to

collect payment from Liberty Mutual under applicable provisions of the Michigan No-Fault Act.

347.    Specialty Med referred patients to MedSpecialists for medically unnecessary treatment and services.

348.    Spine MD billed for alleged testing of MedSpecialists patients to create the appearance they were more injured than they were and to create the appearance of necessity for the services billed by MedSpecialists.

349.    The Count V defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted MedSpecialists to continue billing for medically unnecessary services, if provided at all.

350.    As a result of, and in reasonable reliance on, these misleading documents and representations, Liberty Mutual, by its agents and employees, issued payment drafts to MedSpecialists for the benefit of the Count V defendants that would not otherwise have been paid.

351.    The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

352.    By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted

by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>**COUNT VI**</u>
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(MedSpecialists Enterprise)**
**Against Specialty Medical Center, Inc. and SpineMD of Michigan PLLC**

353.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 305 set forth above as if fully set forth herein.

354.   Defendants Specialty Med and SpineMD ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of MedSpecialists.

355.   The Count VI defendants each agreed to further, facilitate, support, and operate the MedSpecialists enterprise.

356.   As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

357.   The purpose of the conspiracy was to obtain insurance payments from Liberty Mutual on behalf of MedSpecialists even though MedSpecialists was not eligible to collect such payments by virtue of its unlawful conduct.

358.   The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Liberty Mutual of insurance claim and medical documents containing material misrepresentations.

359.   Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make insurance payments as a result of the Count VI defendants' unlawful conduct described herein.

360.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Liberty Mutual and Liberty Mutual is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**<u>COUNT VII</u>**
**COMMON LAW FRAUD**
**Against All Defendants**

361.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 305 set forth above as if fully set forth herein.

362.   The scheme to defraud perpetrated by Specialty Med, SpineMD, and MedSpecialists ("Count VII defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were entitled to collect benefits pursuant to applicable provisions of the Michigan No-Fault Act.

363.   The misrepresentations of fact made by the Count VII defendants include, but are not limited to, those material misrepresentations discussed in section XI.A, *supra*.

364.   The Count VII defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

365.   The misrepresentations were intentionally made by the Count VII defendants in furtherance of their scheme to defraud Liberty Mutual by submitting, causing to be submitted, or knowing that non-compensable claims for payment pursuant to applicable provisions of the Michigan No-Fault Act would be submitted to Liberty Mutual.

366.   The Count VII defendants' misrepresentations were known to be false and were made for the purpose of inducing Liberty Mutual to make payments for claims that are not compensable under Michigan law.

367.   Liberty Mutual reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

368.   As a direct and proximate result of the defendants' fraudulent representations and acts, Liberty Mutual has been damaged in its business and property as previously described herein.

## COUNT VIII
## CIVIL CONSPIRACY
## Against All Defendants

369.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 305 set forth above as if fully set forth herein.

370.   Defendants Specialty Med, SpineMD, and MedSpecialists ("Count VIII defendants") combined and acted in concert to accomplish the unlawful purpose of defrauding Liberty Mutual by submitting claims for payment pursuant to applicable provisions of the Michigan No-Fault Act to which they were not entitled because (1) the defendants did not actually render the treatment for which claims were submitted, (2) the defendants did not provide reasonably necessary medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants engaged in fraudulent billing practices.

371.   The Count VIII defendants worked together to achieve an unlawful purpose (namely, defrauding Liberty Mutual for personal gain).

372.   This purpose was known to all of the Count VIII defendants and intentionally pursued.

373.   Indeed, as detailed above, the Count VIII defendants engaged in inter-referrals to each other of patients for unnecessary treatment and testing so that each could submit improper bills to Liberty Mutual.

374.   Despite knowing that the defendants were not entitled to payment pursuant to applicable provisions of the Michigan No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they engaged in fraudulent billing practices, the Count VIII defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Liberty Mutual seeking payment.

375.   As a result of, and in reasonable reliance on, the false medical documentation submitted by the defendants, Liberty Mutual paid certain of the claims submitted.

376.   All of the Count VIII defendants directly benefited from the payments made by Liberty Mutual.

377.   All of the Count VIII defendants actively and intentionally partook in a scheme to defraud Liberty Mutual and also encouraged and aided other Count VIII defendants in the commission of acts done for the benefit of all Count VIII defendants and to the unjustified detriment of Liberty Mutual.

378.   Accordingly, all of the Count VIII defendants are equally liable for the fraud perpetrated on Liberty Mutual pursuant to their conspiracy.

## <u>COUNT IX</u>
## PAYMENT UNDER MISTAKE OF FACT
### Against All Defendants

379.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 305 set forth above as if fully set forth herein.

380.   Liberty Mutual made payments to the defendants under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Liberty Mutual by misrepresenting the fact, lawfulness, and necessity of services purportedly provided and billed by Specialty Med, SpineMD, and MedSpecialists ("Count IX defendants").

381.   Liberty Mutual sustained damages by paying under a mistake of fact the claims submitted by the Count IX defendants, which misrepresented the fact, reasonableness, necessity, and lawfulness of the medical services allegedly rendered and whether the patient's injury arose out of a motor vehicle accident.

382.   The Count IX defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Liberty Mutual under a mistake of fact.

383.   Liberty Mutual is entitled to restitution from each of the Count IX defendants, individually and jointly, for all monies paid to and/or received by them from Liberty Mutual.

384.   The Count IX defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT X
## UNJUST ENRICHMENT
### Against All Defendants

385.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 305 set forth above as if fully set forth herein.

386.   Defendants Specialty Med, SpineMD, and MedSpecialists ("Count X defendants") submitted, caused to be submitted, or benefited from claims submitted to Liberty Mutual that caused Liberty Mutual to pay money, in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

387.   Liberty Mutual's payments constitute a benefit that the Count X defendants aggressively sought and voluntarily accepted.

388.   The Count X defendants wrongfully obtained or benefited from payments from Liberty Mutual through the fraudulent scheme detailed herein.

389.   The Count X defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XI
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

390.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 305 set forth above as if fully set forth herein.

391.   Defendants Specialty Med, SpineMD, and MedSpecialists ("Count XI defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

392.   The Count XI defendants also billed for services not rendered.

393.   The Count XI defendants also billed for services pursuant to a fraudulent scheme whereby patients were subjected to medically unnecessary treatment, testing, and services.

394.   Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment arising out of a motor vehicle accident.  Mich. Comp. Laws §§ 500.3105, 500.3107, and 500.3157(1).

395.   The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.  Mich. Comp. Laws § 500.3107.

396.   The lack of lawfully-rendered treatment (such as treatment arising from unlicensed treatment) is also a defense to an insurer's obligation to pay No-Fault benefits.  Mich. Comp. Laws §§ 500.3157(1).

397.   Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

398.   The Count XI defendants continue to submit claims under applicable provisions of the Michigan No-Fault Act for unnecessary and unlawfully rendered medical services to Liberty Mutual, and other claims remain pending with Liberty Mutual.

399.   The Count XI defendants will continue to submit claims under applicable provisions of the Michigan No-Fault Act absent a declaration by this Court that Liberty Mutual has no obligation to pay fraudulent pending and previously-denied insurance claims submitted by any of the Count XI defendants for any or all of the reasons set out in the within Complaint.

400.   Accordingly, Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XI defendants billed for unnecessary and unlawful treatment that is not compensable under applicable provisions of the Michigan No-Fault Act.

401.   Liberty Mutual also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XI defendants were engaged in a fraudulent scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Liberty Mutual at all relevant times.

402.   As such, the Count XI defendants have no standing to submit, pursue, or receive benefits or any other payment from Liberty Mutual, and Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XI defendants cannot seek payment from Liberty Mutual for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the wrongful conduct detailed in the within Complaint.

403.   Liberty Mutual further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XI defendants cannot balance bill or otherwise seek payment from any person insured under a Liberty Mutual policy or for whom Liberty Mutual is the responsible payor related to the wrongful conduct detailed in the within Complaint.

## XV.    <u>DEMAND FOR RELIEF</u>

WHEREFORE, plaintiffs LM General Insurance Company, LM Insurance Corporation, Liberty Mutual Personal Insurance Company, American Economy Insurance Company, and Safeco Insurance Company of Illinois respectfully pray that judgment enter in their favor as follows:

<u>COUNT I</u>
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Specialty Med Enterprise)**
**Against SpineMD of Michigan PLLC and MedSpecialists of Michigan,**
**Professional Limited Liability Company**

(a)    AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

<u>COUNT II</u>
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Specialty Med Enterprise)**
**Against SpineMD of Michigan PLLC and MedSpecialists of Michigan,**
**Professional Limited Liability Company**

(a)    AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)      AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)      GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (SpineMD Enterprise)
### Against Specialty Medical Center, Inc. and MedSpecialists of Michigan, Professional Limited Liability Company

(a)      AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)      AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)      GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (SpineMD Enterprise)
### Against Specialty Medical Center, Inc. and MedSpecialists of Michigan, Professional Limited Liability Company

(a)      AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

<u>**COUNT V**</u>
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(MedSpecialists Enterprise)**
**Against Specialty Medical Center, Inc. and SpineMD of Michigan PLLC**

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

<u>**COUNT VI**</u>
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(MedSpecialists Enterprise)**
**Against Specialty Medical Center, Inc. and SpineMD of Michigan PLLC**

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)      AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)      GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

### COUNT VII
### COMMON LAW FRAUD
**Against All Defendants**

(a)      AWARD Liberty Mutual its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)      AWARD Liberty Mutual its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)      GRANT all other relief this Court deems just.

### COUNT VIII
### CIVIL CONSPIRACY
**Against All Defendants**

(a)      AWARD Liberty Mutual its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)      AWARD Liberty Mutual its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)      GRANT all other relief this Court deems just.

**COUNT IX**
**PAYMENT UNDER MISTAKE OF FACT**
**Against All Defendants**

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

**COUNT X**
**UNJUST ENRICHMENT**
**Against All Defendants**

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

**COUNT XI**
**DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201**
**Against All Defendants**

(a)     DECLARE that Liberty Mutual has no obligation to pay pending and previously-denied insurance claims submitted by Specialty Medical Center, Inc., SpineMD of Michigan PLLC, and MedSpecialists of Michigan, Professional Limited Liability Company, jointly and severally, for any or all of the reasons set out in the within Complaint;

(b)     DECLARE that Specialty Medical Center, Inc., SpineMD of Michigan PLLC, and MedSpecialists of Michigan, Professional Limited Liability Company, jointly and severally, cannot seek payment from Liberty Mutual pursuant to the

77

Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the wrongful conduct detailed in the within Complaint;

(c)     DECLARE that Specialty Medical Center, Inc., SpineMD of Michigan PLLC, and MedSpecialists of Michigan, Professional Limited Liability Company, jointly and severally, cannot balance bill or otherwise seek payment from any person insured under a Liberty Mutual policy or for whom Liberty Mutual is the responsible payor related to the wrongful conduct detailed in the within Complaint; and

(d)     GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XVI.     **DEMAND FOR JURY TRIAL**

The plaintiffs hereby demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,

KTM

*/s/ Andrew H. DeNinno*

_____
Nathan A. Tilden (P76969)
ntilden@ktmpc.com
Andrew H. DeNinno
adeninno@ktmpc.com
William G. Potter
wpotter@ktmpc.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

Dated:  March 27, 2024          *Attorneys for Plaintiffs*